[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 9, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-16213
Non-Argument Calendar

_____

BIA Nos. A77-883-619 & A77-883-620

LILIYA ALEKSANDR POPOVA,
OLEGA ANDREY ANDRIICHUK,
ALEKSANDR MOGUTS,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(May 9, 2007)**

Before HULL, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

Liliya Popova, Aleksandr Moguts and Olega Andriichuk (collectively "the

petitioners") petition for review of a final order of the Board of Immigration Appeals ("BIA"), affirming the immigration judge's ("IJ's") denial of their applications for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT").  After review, we deny the petition.

## I.  BACKGROUND

Petitioner Popova, a native of Ukraine and a citizen of Estonia, and petitioner Moguts, Popova's father, a native and citizen of Ukraine, were admitted to the United States on September 5, 1999, with authorization to remain until March 4, 2000.  Popova's husband, petitioner Andriichuk, a native and citizen of the Ukraine, had arrived a few months earlier and had permission to remain until January 24, 2000.  In August 2002, all three petitioners filed applications for asylum, withholding of removal and CAT relief, claiming persecution in Estonia based on their Ukranian nationality.

## A.    Asylum Application

In an affidavit attached to her asylum application, Popova stated that, after Estonia gained independence from the U.S.S.R., ethnic Estonians began driving Russian-speaking people out of Estonia.  Popova claimed that she was teased at work and then fired without explanation.  Her mother died in a hospital after she was not given proper medical care because she was not Estonian.  Popova had difficulty finding employment, and she and her husband, Andriichuk, opened their

2

own business.  However, when Popova and Andriichuk refused to bribe bureaucrats, they received threatening telephone calls and their apartment was ransacked and covered with swastikas.  Popova's appeals to the police were met with indifference because she was not Estonian.

Popova wrote a complaint to the Public Prosecutor about the local police chief, Yanis Tuulya, whom Popova believed was behind everything.  According to Popova, this is when the "real terror" began.  In 1998, "a few men" stormed into her apartment, brutally beat her and her father, Moguts, called her a "Russian pig," and told her to "get the hell out of here as soon as possible."  As a result, Popova and her husband, Andriichuk, went to live temporarily with a friend in another city in Estonia, while her father remained in their home.

Popova's friend had a brother who worked for the police and offered to help.  Popova wrote another complaint, which the friend's brother promised to deliver to the proper office.  After writing the letter, on February 12th, "Yanis' people" beat her father and her husband and stabbed her husband in the leg.  At this point, Popova and her husband, Andriichuk, decided to leave Estonia for the United States.

Once in the United States, Popova and her husband fell into the hands of an unscrupulous "speculator" who offered to help them, but then took their documents and made them work as slaves.  With the help of her church, Popova was able to

3

pay off her debt and get her documents back.

**B.    Asylum Interview**

At an asylum interview, Popova testified through a translator, Azik Ailyev. During the interview, Popova stated, among other things, that skinheads destroyed her apartment and business in January 1998 because they hated her and did not want her business to succeed.  Popova said she knew the people who ransacked her apartment were skinheads because they drew swastikas and wrote "Russian Pig, get out" on the wall of the apartment.  Popova also stated that her husband, Andriichuk, and father, Moguts, were beaten in February or March 1998 because she complained to the police and that her husband was stabbed.

**C.    Removal Hearing**

The Department of Homeland Security issued Notices to Appear, charging that Popova, her husband, Andriichuk, and her father, Moguts, were subject to removal as nonimmigrants who had remained in the United States longer than permitted.  The petitioners conceded removability.

At the removal hearing, Popova testified that people in Estonia threatened her and wrote words on the door of her apartment, which lead her to abandon her apartment.  According to Popova, late at night in the summer of 1998, two police officers ransacked her apartment and beat her, her husband, Andriichuk, and her father, Moguts.  Popova was hospitalized from the beating.  Popova and her

4

husband, Andriichuk, fled their apartment, moving twice and then traveling to the United States. Popova also said that in February, her husband was beaten, cut and told that he and Popova had to leave and that Popova's dog would be dismembered if they did not leave. When asked who had threatened her husband, Popova responded that it was the same people who had attacked them in December 1998.

Popova also explained that her translator during the asylum interview, Ailyev, misrepresented himself to her as an attorney. According to Popova, Aliyev told her to tell the interviewer that Popova had met him only the day before the interview and, if asked, to deny that Ailyev was her attorney.

On cross-examination, Popova admitted that she had made false statements at the asylum interview because she "would have had more serious problems with Ailyev than with the authorities." Popova also testified that the only time her apartment in Estonia was ransacked was by two police officers in December 1998. Finally, Popova admitted that she had applied for asylum when she was in the United States in 1997 and 1998, but had voluntarily returned to Estonia.

In support of their applications, the petitioners submitted, inter alia: (1) a document from Tapa Hospital, dated October 2000, stating that Popova was treated in December 1998, for stomach and facial injuries and complained of being upset because two men broke into her apartment, demanded money, and beat her; (2) documents from Florida state court, indicating that Aliyev had been charged with

5

welfare fraud and battery; (3) the U.S. Department of State 2004 Country Report for Estonia ("Country Report"); (4) a 2004 report, entitled "Assessment for Russians in Estonia," written for the Minorities at Risk Project at the University of Maryland, which stated that the potential for conflict between ethnic Russians and Estonians had declined over the recent years, and, in addition to the capital city, the ethnic-Russian population is concentrated in two cities on the Russian border; and (5) a document, dated February 23, 1999, indicating that Popova's husband, Andriichuk, was treated for stab wounds and bruises between February 12 and 23, 1999.

**D.      IJ's Decision**

The IJ denied all requested relief and ordered the petitioners removed to Estonia. Specifically, the IJ denied the petitioners' request for asylum because their application was time-barred. The IJ denied the request for CAT relief because the petitioners had failed to show that they were tortured in Estonia or would likely be tortured if returned to Estonia.

With regard to withholding of removal, the IJ found that inconsistencies in Popova's application and her testimony were substantial enough to warrant a finding that her claims were not credible. In so finding, the IJ pointed to inconsistencies between her application, her testimony, and medical records. The IJ cited the discrepancies pointed out by the government in closing arguments,

6

which included inconsistencies between Popova's application and testimony regarding the ransacking of her apartment and inconsistencies between Popova's testimony about the date on which her husband, Andriichuk, was stabbed and the date on the medical record submitted in support of the application. The IJ also found that the events Popova described, even if credible, did not amount to persecution and were the result of "several isolated corrupt government officials." The IJ also noted that the Country Report indicated that many ethnic Russians live in the eastern portions of the country, in Narva and Katlajarva, and that the petitioners had not claimed that they could not relocate within Estonia. Based on the Country Report's conclusion that ethnic Russians face discrimination and economic difficulties, but rarely physical mistreatment, the IJ found that the petitioners had "embellish[ed]" their applications. The IJ stated, "There may have been some discrimination regarding their economic position in Estonia, but I believe that basically that does not amount to persecution . . . ." The IJ also concluded that petitioners had failed to show that they would be persecuted for their nationality if they were returned to Estonia.

## E. BIA's Decision

The petitioners appealed to the BIA, challenging the IJ's credibility finding. The petitioners submitted another medical document, dated April 13, 2005, indicating that Popova's husband, Andriichuk, was treated for stab wounds in

7

February 1998, not 1999.  Petitioners' accompanying brief stated that Popova's apartment was ransacked in the summer of 1998 and that she and her husband were beaten by two police officers.

The BIA affirmed the IJ's decision, finding no clear error in the IJ's factual findings.  The BIA repeated the IJ's findings, noting, in relevant part, that the IJ found inconsistencies between the asylum application, the interview and the testimony of record and that the events Popova described did not rise to the level of persecution per se.  All three Petitioners jointly filed this petition for review.

## II.  DISCUSSION

### A.  Withholding of Removal[1]

An alien is entitled to withholding of removal if he can show that his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion.  Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003); see also INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A).  To qualify for withholding of removal, an alien must show that it is more likely than not that he will be persecuted or tortured upon his return to the country in question.  INS v. Cardoza-Fonseca, 480 U.S. 421, 429, 107

---

[1]On appeal the petitioners argue only that they are eligible for withholding of removal and do not challenge the IJ and BIA's determinations with regard to asylum or CAT relief. Therefore, we do not address these claims further.  See Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1286 n.3 (11th Cir. 2003).

S. Ct. 1207, 1212 (1987); <u>Mendoza</u>, 327 F.3d at 1287.  The alien can meet this burden by showing either: (1) "past persecution in his country based on a protected ground," in which case a rebuttable presumption is created that his life or freedom would be threatened if he returned to his country; or (2) "a future threat to his life or freedom on a protected ground in his country."  <u>Mendoza</u>, 327 F.3d at 1287.

**B.     Credibility Findings**

"The testimony of an applicant, if found to be credible is alone sufficient to establish" eligibility for withholding of removal.  <u>See</u> <u>Forgue v. U.S. Att'y Gen.</u>, 401 F.3d 1282, 1287 (11th Cir. 2005) (citing, <u>inter</u> <u>alia</u>, 8 C.F.R. § 208.16(b)).  "Conversely, an adverse credibility determination alone may be sufficient to support the denial" of withholding of removal.  <u>See</u> <u>id.</u>  Nevertheless, the IJ must consider all the evidence submitted by the applicant, including any documentation.  <u>Id.</u>  The IJ must provide "specific, cogent reasons" for his credibility finding.  <u>Id.</u>  "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility determination was not supported by 'specific, cogent reasons' or was not based on substantial evidence."  <u>Id.</u>[2]

**C.     IJ's Adverse Credibility Finding**

On appeal, the petitioners challenge only the IJ's adverse credibility

---

[2]We review credibility findings under the substantial evidence test, and "like any fact finding, [they] may not be overturned unless the record compels it."  <u>Forgue</u>, 401 F.3d at 1286-87 (quotation marks omitted).

finding.[3] After review, we conclude that the IJ provided specific, cogent reasons for his adverse credibility finding – namely the inconsistencies in Popova's various statements – and that the IJ's credibility determination is supported by substantial evidence.

In her asylum application, asylum interview and hearing testimony, Popova gave materially different accounts of her alleged mistreatment in Estonia. In her affidavit attached to her application and at the asylum hearing, Popova stated that skinheads ransacked her apartment in January 1998. However, at the hearing, Popova admitted that this claim was false.

In her application affidavit, Popova also stated that, in 1998, "a few men" broke into her apartment and beat her and her father, Moguts. However, at the asylum interview Popova stated that it was her husband and father who were beaten in February or March of 1998. At the hearing, Popova testified that two police officers broke into her apartment and beat her, her husband and her father. At one point, Popova testified that the date of this police beating was the summer of 1998. Later in the hearing, Popova testified that the police beating happened in December of 1998. In other words, Popova could not consistently identify either the date or the victims of this attack.

---

[3]Because the BIA's decision adopted the IJ's findings as to credibility and eligibility for withholding of removal, we review the orders of both the BIA and the IJ. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001).

In addition, Popova's supporting documentation contradicts her version of events. In her brief filed with the BIA, Popova stated that the police beat her and ransacked her apartment in the summer of 1998. However, the medical document Popova submitted indicates that she was treated for this attack in December 1998. These inconsistencies are substantial evidence that supports the IJ's credibility finding.

The petitioners argue that Popova's memory lapses can be attributed to the trauma of her involuntary servitude in the United States or to her fear of Ailyev, her translator during the asylum interview. These arguments do not compel the conclusion that the credibility finding should be overturned.

The petitioners do not contend that the supporting documentation, alone, compels a conclusion that Popova was persecuted. Therefore, we cannot say that the record as a whole compels reversal.

**PETITION DENIED.**